**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Michael A. Griffiths

   v.                                           Civil No. 11-cv-195-JL

Michael J. Astrue, Commissioner
Social Security Administration

**REPORT AND RECOMMENDATION**

Pursuant to 42 U.S.C. § 405(g), Michael Griffiths moves to reverse the Commissioner's decision denying his application for Social Security disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423.  The Commissioner, in turn, moves for an order affirming his decision.  For the reasons that follow, I recommend that the decision of the Commissioner, as announced by the Administrative Law Judge ("ALJ"), be affirmed.

**Standard of Review**

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without
> remanding the cause for a rehearing.  The findings of
> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g).  However, the court "must uphold a denial of social security disability benefits unless 'the [Commissioner] has committed a legal or factual error in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts."  Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (citations omitted).  Moreover, the court "must uphold the

[Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988). Finally, when determining whether a decision of the Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole." Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

### Background

The parties have submitted a Joint Statement of Material Facts, document no. 17. That statement is part of the court's record and will be summarized here, rather than repeated in full.

In May of 2008, Griffiths saw Nurse Practitioner ("NP") Barbara Hatch complaining of tingling in both legs. A lumbar-spine x-ray resulted in the following impression:

> Anterolisthesis of L5 on S1 and less of so on L4 and L5 in extension. Mild retrolisthesis of L3 on L4. I suspect that there is a pars defect at L5.
>
> Considering the patient has neurological signs, MRI suggested for further evaluation.

Administrative Transcript (hereinafter "Tr.") 255. NP Hatch assessed Griffiths as having a tingling sensation, abdominal

pain (due to a preumbilical hernia),[1] and low back pain.  <u>See</u> Tr.

231.  Shortly thereafter, she assessed him as having

degenerative disc disease.  <u>See</u> Tr. 226.  That assessment was,

presumably, based on the following impression from Griffiths'

MRI:

> The patient certainly has degenerative disease with
> marked disc space narrowing at L5-S1.  L5 is anterior
> in relationship to L4 and S1 and I suspect there are
> bilateral pars defects which would be elegantly shown
> on CT should you wish to pursue this.  Mild
> degenerative changes are also present at T11-12 but no
> stenosis[2] results.

Tr. 254.

In July of 2008, Griffiths was seen by Dr. Russell

Brummett, an orthopedist, who reviewed MRI films showing "an L5-

S1 isthmic spondylolisthesis[3] with foraminal stenosis at that

level of a fairly severe degree and degenerative changes at L4-

L5."  Tr. 256.  Dr. Brummett's impression was spondylolisthesis.

In September of 2008, Dr. Brummett noted that new "flexion-

extension views of [Griffiths'] lumbar spine . . .

demonstrate[d] a 2-level spondylolisthesis with significant

---

[1] Griffiths underwent surgery for his hernia on February 2,
2009.  <u>See</u> Tr. 250-51.

[2] Stenosis is "[a] stricture of any canal or orifice."
Stedman's Medical Dictionary 1832 (28th ed. 2006).

[3] Spondylolisthesis is "[f]orward movement of the body of
one of the lower lumbar vertebrae on the vertebra below it, or
on the sacrum."  <u>Stedman's</u>, <u>supra</u> note two, at 1813.

motion occurring at both L4-L5 and L5-S1 [and] an isthmic variety at L5-S1." Tr. 262.

Griffiths has received a variety of treatment for his back condition, including oral steroids, physical therapy, epidural injections, a trial of electrical stimulation, and surgery. That surgery, characterized as a "fairly complex lumbar decompression and stabilization," Tr. 261, was performed in October of 2008. Two weeks out from Griffiths' surgery, Dr. Brummett wrote that "AP and lateral x-rays show[ ] instrumentation and grafts in good position." Id. Dr. Brummett made a similar observation in January of 2009. See Tr. 259. As a result of Griffiths' six-month check-up, Physician's Assistant ("PA") Alan Parzick reported: "AP and lateral of [Griffiths'] lumbar spine . . . show[ ] interbody graft and posterior instrumentation to be in excellent position and alignment." Tr. 258. PA Parzick ordered an MRI "to check things out as [Griffiths] was having some ongoing pain." Tr. 257. According to Dr. Brummett, "[t]he MRI [did] not show any major compressive pathology at any level, and the decompression appears nicely maintained." Id. In June of 2009, Dr. Brummett again reported that x-rays showed that Griffiths' "instrumentation and graft [were] in perfect position with a hyperlordosis." Tr. 311. Dr. Brummett referred Griffiths to a pain management physician.

In September of 2009, Griffiths was diagnosed by Dr. Andrew Kowal as having "Lumbar Facet Syndrome, low back pain, [and] failed back syndrome."  Tr. 314.  Dr. Kowal performed a "Diagnostic Blockade of the Medial Branch Nerves of the L2-L3, L3-4, Facet joints Bilaterally, under fluoroscopic guidance." Id.  About three weeks later, Griffiths was seen by Dr. Brian Scott for a neurological consultation.  Dr. Scott provided the following impression:

> This is a 36-year-old man with intense pain and numbness in the anterolateral thighs, consistent with an upper lumbar radiculopathy.  He had lumbar fusion of L4-L5, L5-S1, and these symptoms appear to be somewhat distinct from that syndrome.  He had some relief with facet blockade at L2-L3 and L3-L4, which I think is likely the location of his discomfort.  In the absence of any surgical issues in the lumbar spine, ongoing pain management strategies seem reasonable, which may include a lumbar denervation procedure.  I have recommended increasing his Neurontin from 300 t.i.d. up to 600 t.i.d. as tolerated in 300 mg increments.  I have advised Mr. Griffiths is to keep his appointment with Dr. Kowal in followup for further consideration in pain management strategies.

Tr. 313.

On July 9, 2009, state-agency consultant Dr. Joseph Cataldo completed a Physical Residual Functional Capacity ("RFC") assessment on Griffiths.  See Tr. 273-81.  In terms of exertional limitations, Dr. Cataldo opined that Griffiths had the capacity to: (1) lift and/or carry twenty pounds occasionally and ten pounds frequently; (2) stand and/or walk

6

(with normal breaks), and sit (with normal breaks), for about
six hours in an eight-hour workday; and (3) push and/or pull
without any limitation other than the limitation on his ability
to lift and carry.  In terms of postural limitations, Dr.
Cataldo found that Griffiths could occasionally climb
ramps/stairs, climb ladders/ropes/scaffolds, balance, stoop,
kneel, crouch, and crawl.  He found no manipulative, visual, or
communicative limitations.  Finally, Dr. Cataldo found only a
single environmental limitation,[4] a need to avoid even moderate
exposure to hazards, defined as "machinery, heights, etc."  Tr.
277.

　　　In November of 2009, NP Hatch completed a one-page form,
from the New Hampshire Department of Health and Human Services,
titled "Determination of Incapacity Status."  Tr. 316.  In it,
she stated that Griffiths had been incapacitated by "s/p lumbar
decompression & stabilization" since June of 2008.  Id.

　　　The ALJ conducted a hearing at which he took testimony from
Griffiths and a vocational expert ("VE").  The ALJ asked the VE
several hypothetical questions, including ones based on a person
able to do light work, a person able to do only sedentary work,
a person who would be off task for ten minutes every hour due to

---

　　　[4] That is, Dr. Cataldo determined that Griffiths had an
unlimited capacity to deal with extreme cold, extreme heat,
wetness, humidity, noise, vibration, fumes, odors, dusts,
gasses, and poor ventilation.

pain, a person who would have two unscheduled absences per month, and a person who had to lie down for two hours in an eight-hour workday.  The VE testified that none of the last three individuals would be capable of substantial gainful activity.

After the hearing, the ALJ issued a decision that includes the following relevant findings of fact and conclusion of law:

> 3.  The claimant has the following severe impairments: degenerative disc disease of the lumbar spine status post decompression and stabilization, umbilical hernia, obesity, and an adjustment disorder (20 CFR 404.1520(c)).
>
> . . . .
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> . . . .
>
> 5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant must avoid even moderate exposure to hazards such as dangerous moving machinery and unprotected heights.  In addition, the claimant is limited to routine and repetitive tasks.
>
> . . . .
>
> 6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).
>
> . . . .

> 10.  Considering the claimant's age, education, work
> experience, and residual functional capacity, there
> are jobs that exist in significant numbers in the
> national economy that the claimant can perform (20 CFR
> 404.1569 and 404.1569(a)).

Tr. 11, 12, 13-14, 15 16.  Based on the testimony of the VE, the

ALJ found that Griffiths could work as a telephone-quotation

clerk, as a printed-circuit-board assembler, and as a lens

inserter.

## Discussion

According to Griffiths, the ALJ's decision should be

reversed, or his case remanded, because the ALJ erroneously

found that: (1) his back impairment did not meet the

requirements of listing 1.04; and (2) his statements about

disabling pain were not credible.

### A. The Legal Framework

To be eligible for disability insurance benefits, a person

must: (1) be insured for such benefits; (2) not have reached

retirement age; (3) have filed an application; and (4) be under

a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  The only question

in this case is whether Griffiths was under a disability.

For the purpose of determining eligibility for disability

insurance benefits,

> [t]he term "disability" means . . . inability to
> engage in any substantial gainful activity by reason

of any medically determinable physical or mental
impairment which can be expected to result in death or
which has lasted or can be expected to last for a
continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  Moreover,

[a]n individual shall be determined to be under a
disability only if his physical or mental impairment
or impairments are of such severity that he is not
only unable to do his previous work but cannot,
considering his age, education, and work experience,
engage in any other kind of substantial gainful work
which exists in the national economy, regardless of
whether such work exists in the immediate area in
which he lives, or whether a specific job vacancy
exists for him, or whether he would be hired if he
applied for work.  For purposes of the preceding
sentence (with respect to any individual), "work which
exists in the national economy" means work which
exists in significant numbers either in the region
where such individual lives or in several regions of
the country.

42 U.S.C. § 423(d)(2)(A).

To decide whether a claimant is disabled for the purpose of

determining eligibility for disability insurance benefits, an

ALJ is required to employ a five-step process.  See 20 C.F.R. §

404.1520.

The steps are: 1) if the [claimant] is engaged in
substantial gainful work activity, the application is
denied; 2) if the [claimant] does not have, or has not
had within the relevant time period, a severe
impairment or combination of impairments, the
application is denied; 3) if the impairment meets the
conditions for one of the "listed" impairments in the
Social Security regulations, then the application is
granted; 4) if the [claimant's] "residual functional
capacity" is such that he or she can still perform
past relevant work, then the application is denied; 5)
if the [claimant], given his or her residual

> functional capacity, education, work experience, and
> age, is unable to do any other work, the application
> is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920, which outlines the same five-step process as

the one prescribed in 20 C.F.R. § 404.1520).

The claimant bears the burden of proving that he is

disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  He

must do so by a preponderance of the evidence.  See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11) (D. Mass. 1982)).  Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) [claimant]'s
> subjective claims of pain and disability as supported
> by the testimony of the [claimant] or other witness;
> and (3) the [claimant]'s educational background, age,
> and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

B. Griffiths' Arguments

Griffiths contends that the ALJ erred by failing to

determine that he had a listing-level back impairment and by

finding his statements about the disabling effects of his

impairments not to be credible.  The court considers each
argument in turn.

### 1. Step Three

At step three of the sequential evaluation process, the ALJ
determined that Griffiths' degenerative disc disease of the
lumbar spine status post decompression and stabilization did not
meet or equal Listing 1.04.  In making that determination, the
ALJ noted that "[a]lthough there is evidence of degenerative
disc disease and subsequent surgery, there is no evidence of
nerve root or spinal cord compromise with nerve-root
compression, spinal arachnoiditis, or lumbar spinal stenosis."
Tr. 12.  According to Griffiths, the ALJ's "reasoning is
inherently flawed."  Cl.'s Mem. of Law (doc. no. 13-2), at 4.
Specifically, Griffiths argues that: (1) his nerve root problems
are evidenced by the procedures he has had and those suggested
for him in the future; (2) his medical records clearly document
his ongoing pain; and (3) the ALJ failed to mention the findings
of Dr. Scott.

In the decision, the ALJ wrote: "After a diagnostic
blockade of several lumbar nerves in September 2009, a
consulting neurologist, Brian J. Scott, MD, opined that the
claimant's pain symptoms were located at L2-3 and L3-4 and
recommended a lumbar denervation procedure.  Dr. Scott also

recommended increasing the claimant's medication, Neurontin."
Tr. 12.  Thus, Griffiths' third argument is baseless; the ALJ
most assuredly did mention Dr. Scott's findings.  Griffiths'
second argument, based on reports of pain in his medical records
is irrelevant at step three, where the ALJ's only job is to
determine whether a particular medical condition matches one of
the impairments listed in the social security regulations.  That
leaves Griffiths' first argument, that his demonstrated nerve-
root problems entitle him to a determination that he has a
listed impairment.  He is mistaken.

Under the category of musculoskeletal impairments, the
regulations identify Listing 1.04 as "[d]isorders of the spine."
20 C.F.R. § 404, subpt. P, app. 1.  That impairment is described
as follows:

> Disorders of the spine (e.g., herniated nuculeus
> pulposus, spinal arachnoiditis, spinal stenosis,
> osteoarthritis degenerative disc disease, facet
> arthritis, vertebral fracture), resulting in
> compromise of a nerve root (including the cauda
> equina) or the spinal cord.  With:
>
> A. Evidence of nerve root compression
> characterized by neuro-anatomic distribution of pain,
> limitation of motion of the spine, motor loss (atrophy
> with associated muscle weakness or muscle weakness)
> accompanied by sensory or reflex loss and, if there is
> involvement of the lower back, positive straight-leg
> raising test (sitting and supine);
>
> or

13

B. Spinal arachnoiditis, confirmed by an
operative note or pathology report of tissue biopsy,
or by appropriate medically acceptable imaging,
manifested by severe burning or painful dysesthesia,
resulting in the need for changes in position or
posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in
pseudoclaudication, established by findings on
appropriate medically acceptable imaging, manifested
by chronic nonradicular pain and weakness, and
resulting in inability to ambulate effectively, as
defined in 1.00B2b.

Id.

Here, Griffiths has been diagnosed with degenerative disc
disease, which is identified as an example of a disorder of the
spine in Listing 1.04.  However, while Griffiths once suffered
from "significant compressive pathology to the exiting L5 nerve
roots," Tr. 262, which certainly counts as the compromise of a
nerve root, there is no evidence that he still suffers from the
compromise of a nerve root, and substantial evidence that he
does not.

Before he operated on Griffiths, in September of 2008, Dr.
Brummett identified compression of the L5 nerve roots.  He
performed a lumbar decompression and stabilization.  In his
operative report from October of 2008, Dr. Brummett reported:

The dissection was further completed to identify the
existing nerve roots at both the L4 and L5 and S1
levels.  The L4 and L5 nerve roots were noted to be
severely compressed bilaterally, extremely so on the

> right side where exiting nerves were severely
> compressed due to collapsed foramen.  These were
> explored and careful foraminotomies[5] accomplished with
> 2 and 3 Kerrisons to basically decompress the foramina
> as much as possible for each of those nerve roots
> . . . .  Valsalva showed no extravasation of CSF and
> the foraminotomy and laminectomy was confirmed and
> noted to be nicely freed up with no evidence of any
> residual compressive pathology and foramina were now
> nicely patent at both the L5 foramina as well as the
> L4 foramen.

Tr. 186-87.

In May of 2009, Dr. Brummett reviewed a then-recent MRI

which showed no "major compressive pathology at any level" and

that "the decompression appears nicely maintained."  Tr. 257.

When Griffiths sought treatment from Dr. Scott, Dr. Scott

focused his attention on Griffiths' L2-L3 and L3-L4 joints,

rather than the L4-L5 and L5-S1 joints that were the location of

Griffiths' compressed nerve roots.  Moreover, Dr. Scott's

progress note says nothing about nerve-root compression or

compromise, and indicates that Griffiths did not have "any

surgical issues in the lumbar spine," Tr. 313, which would seem

to rule out nerve-root compression, which was the condition Dr.

Brummett addressed through surgery.  Finally, while Griffiths

correctly notes that Dr. Scott recommended further treatment,

---

[5] Foraminotomy is "[a]n operation on an aperture, usually to
open it, e.g., surgical enlargement of the intervertebral
foramen."  Stedman's, supra note 2, at 759.  An intervertebral
foramen, in turn, is "one of the lateral openings to the
vertebral canal giving passage to the spinal nerves and
vessels."  Id. at 757.

there is nothing in the record to suggest that: (1) Dr. Scott recommended treating the location on Griffith's lumbar spine where he had suffered from compressed nerve roots; or (2) the non-surgical treatment Dr. Scott recommended had anything to do with nerve-root compression.  In sum, there is substantial evidence in the record that while Griffiths once suffered from several compromised nerve roots, his nerve-root compression was fully resolved by Dr. Brummett's surgery.  Thus, the ALJ committed no error by determining that Griffiths' disorder of the spine did not meet Listing 1.04.

The demonstrated absence of ongoing nerve-root compromise is enough to foreclose Griffiths' argument that he has a listing-level spinal disorder, based on the general provisions of Listing 1.04.  Nonetheless, the court turns briefly to the three specific provisions of Listing 1.04.  For the reasons already stated, there is substantial evidence that Griffiths does not have nerve-root compression, as required by paragraph A.  Moreover, while the medical record appears to include the results of two straight-leg raising tests,[6] one conducted before Griffiths' surgery, the other conducted afterward, both were negative.  See Tr. 256, 311.  Paragraph A requires a positive

---

[6] The Commissioner directed the court to the two negative tests.  Griffiths neither acknowledges those negative tests nor attempts to direct the court to evidence of any positive straight-leg raising tests.

straight-leg raising test.  There is no evidence in the record
showing that Griffiths ever suffered from spinal arachnoiditis,
as required by paragraph B.  And, with regard to lumbar spinal
stenosis, which is required for paragraph C, there is evidence
in the record that Dr. Brummett's surgery corrected Griffiths'
stenosis at L4-L5, and no post-surgery imaging showing any signs
of residual or recurring lumbar spinal stenosis.

To summarize, substantial evidence in the record supports
the ALJ's determination that Griffiths does not have a listing-
level disorder of the spine.  The only way the court could reach
a contrary conclusion would be to presume that Griffiths' pre-
surgery diagnosis of nerve-root compression will stay with him
forever, notwithstanding successful surgery to correct that
condition.  Such a presumption, of course, would be absurd.

### 2. Credibility

Griffiths' second argument is that the ALJ committed
reversible error by failing to find his statements about the
limiting effects of pain to be credible.  Among other things, he
criticizes the ALJ for "coming to her own conclusions [about his
credibility] instead of relying on those of [his] treating
doctors."  Cl.'s Mem. of Law (doc. no. 13-2), at 7, and for
referring to his daily activities in the context of making a
credibility assessment.  Both arguments are meritless.

17

Turning to Griffiths' first argument, an ALJ may, indeed, commit reversible error by "craft[ing] an RFC assessment in part from [his or] her own assessment of the raw medical evidence." Kaylor v. Astrue, No. 2:10-cv-33-GZS, 2010 WL 5776375, at *4 (D. Me. Dec. 30, 2010).  But Griffiths has cited no authority, and the court is aware of none, for the proposition that an ALJ must defer to a treating physician's assessment of a claimant's credibility.  Griffiths' second argument has even less merit. As the Commissioner points out, succinctly and correctly, an ALJ making a credibility assessment is not barred from considering the claimant's daily activities; an ALJ is required to do so. See Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *3 (S.S.A. 1996); see also Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) ("While a claimant's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding.") (citing Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 429 (1st Cir. 1991)).  With Griffiths' first two arguments out of the way, the court next assesses the ALJ's credibility assessment under the applicable legal framework.

According to SSR 96-7p, "an individual's statement(s) about his or her symptoms is not in itself enough to establish the existence of a physical or mental impairment or that the individual is disabled."  1996 WL 374186, at *2.  "A symptom is an individual's own description of his or her physical or mental impairment(s)."  Id.  When "symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness," id., are alleged, SSR 96-7p prescribes the following evaluation process:

> * First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) – i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques – that could reasonably be expected to produce the individual's pain or other symptoms. . . .  If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.
>
> * Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

Id.   In addition:

When additional information is needed to assess the
credibility of the individual's statements about
symptoms and their effects, the adjudicator must make
every reasonable effort to obtain available
information that could shed light on the credibility
of the individual's statements.  In recognition of the
fact that an individual's symptoms can sometimes
suggest a greater level of severity of impairment than
can be shown by the objective medical evidence alone,
20 CFR 404.1529(c) and 416.929(c) describe the kinds
of evidence, including the factors below, that the
adjudicator must consider in addition to the objective
medical evidence when assessing the credibility of an
individual's statements:

> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and
> intensity of the individual's pain or other
> symptoms;
>
> 3. Factors that precipitate and aggravate the
> symptoms;
>
> 4. The type, dosage, effectiveness, and side
> effects of any medication the individual takes or
> has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the
> individual receives or has received for relief of
> pain or other symptoms;
>
> 6. Any measures other than treatment the
> individual uses or has used to relieve pain or
> other symptoms (e.g., lying flat on his or her
> back, standing for 15 to 20 minutes every hour,
> or sleeping on a board); and
>
> 7. Any other factors concerning the individual's
> functional limitations and restrictions due to
> pain or other symptoms.

Id. at *3.  In this circuit, the seven considerations listed above are commonly referred to as the Avery factors.

SSR 96-7p outlines a specific staged inquiry that consists of the following questions, in the following order: (1) does the claimant have an underlying impairment that could produce the symptoms he or she claims?; (2) if so, are the claimant's statements about his or her symptoms substantiated by objective medical evidence?; and (3) if not, are the claimant's statements about those symptoms credible?  See Baker v. Astrue, Civ. No. 08-11812-RGS, 2010 WL 3191452, at *8 (D. Mass. Aug. 11, 2010) ("If after evaluating the objective findings, the ALJ determines that the claimant's reports of symptoms are significantly greater than what could be reasonably anticipated from the objective evidence, the ALJ must then consider other relevant information."); Callie v. Comm'r of Soc. Sec., Civ. No. 09-1305, 2010 WL 1424725, at *3 (D.P.R. Apr. 6, 2010) (explaining that "before weigh[ing] the credibility of a claimant's statements about pain . . . [the] ALJ must first find a lack of support in the objective medical evidence for the allegations of pain").

Finally, an ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent

21

reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (emphasis added). Stated a different way, "[i]t is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" Id.

Here, the court can find no fault with the manner in which the ALJ evaluated Griffiths' symptoms. First, the ALJ clearly indicated the statements about pain to which the credibility analysis was being applied. See Weaver v. Astrue, No. 10-cv-340-SM, 2011 WL 2580766, at *6 (D.N.H. May 25, 2011) ("As a starting point for the following analysis, it is necessary to identify the statement(s) at issue."). Then, the ALJ made the first requisite finding, "that [Griffiths'] medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 14. The ALJ went on to make the second requisite finding, that Griffiths' "allegations [about pain] are not fully supported by the medical evidence of record." Tr. 15. To bolster that finding, the ALJ pointed to several specific pieces of medical evidence including reports about Griffiths' gait and negative results from straight-leg raising tests. Griffiths objects generally to the ALJ's

decision, but does not argue that the ALJ's finding was not supported by substantial evidence.  While the record might, possibly, support a determination that Griffiths' statements about pain are supported by objective medical evidence,[7] that is not the test.  See Tsarelka, 842 F.2d at 535 (explaining that the court "must uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence").  As things stand, there is substantial evidence to support the ALJ's determination that Griffiths' allegations of pain were not substantiated by objective medical evidence, and that is dispositive.

Finally, having determined that it was necessary to assess Griffiths' credibility, the ALJ did so, and appears to have touched all of the Avery bases, with citations to evidence in the record.  Griffiths responds by: (1) criticizing the ALJ for considering the first Avery factor, daily activities; (2) arguing that the ALJ gave too much emphasis to the fact that the surgeon who repaired his umbilical hernia released him to full activity; and (3) restating his hearing testimony and other

---

[7] On the one hand, Dr. Scott's suggestion that "ongoing pain management strategies seem reasonable," Tr. 313, is somewhat persuasive.  But, on the other hand, Dr. Scott's progress note includes relatively little objective medical evidence, and Dr. Scott specifically stated that he had not seen Griffiths' MRI images.  See Tr. 313.

statements about his pain.  He does not, however: (1) identify any Avery factor the ALJ did not consider; or (2) demonstrate that the ALJ's credibility assessment was not supported by substantial evidence.  Those failures are fatal to Griffiths' argument.

## Conclusion

Because the ALJ has committed neither a legal nor a factual error in evaluating Griffiths' claim, see Manso-Pizarro, 76 F.3d at 16, I recommend that: (1) Griffiths' motion for an order reversing the Commissioner's decision, document no. 13, be denied; and (2) the Commissioner's motion for an order affirming his decision, document no. 16, be granted.

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the district court's order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011), cert. denied, 181 L. Ed. 2d 268 (2012); Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by objections to magistrate judge's report are subject to review by district

court; issues not preserved by such objection are precluded on appeal).

_____
Landya McCafferty
United States Magistrate Judge

April 3, 2012

cc:  Kelie C. Schneider, Esq.
     Christpher J. Seufert, Esq.
     Gretch Leah Witt, Esq.